A-602-809
Remand
Slip Op. 21-160
POR: 3/22/2016-9/30/2017
**Public Document**
E&C/OV: EWH

*BlueScope Steel LTD. v. United States*,
**Court No. 19-00057, Slip Op. 21-160 (CIT November 30, 2021)**
**Certain Hot-Rolled Steel Flat Products from Australia**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.     SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (CIT), issued on November 30, 2021.[1]  These final results of redetermination concern

Commerce's final results in the administrative review of the antidumping duty (AD) order of

certain hot-rolled steel flat products (hot-rolled steel) from Australia covering the period March

22, 2016, through September 30, 2017, in which Commerce based the final dumping margin for

the sole mandatory respondent, BlueScope Steel Ltd. (BSL), and its affiliate BlueScope Steel

(AIS) Pty (collectively, BlueScope) on total adverse facts available (AFA).[2]  In the *Remand*

*Opinion and Order*, the CIT held that Commerce failed to:  (1) identify a gap in the record with

respect to the quantity and value (Q&V) of BlueScope's U.S. sales; and (2) justify its application

of facts available under 776(a) of the Tariff Act of 1930, as amended (the Act) to BlueScope's

Section B and C Questionnaire responses because it was first required to comply with the

---

[1] *See BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351 at 1369 (CIT 2021) (*Remand Opinion and Order*).
[2] *See Certain Hot-Rolled Steel Flat Products from Australia:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 18241 (April 30, 2019) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

requirements of section 782(d) of the Act.  In connection with the above findings, the CIT remanded the *Final Results* for Commerce to:

(1) determine whether there was in fact a gap in the record;

(2) use BlueScope's Q&V (Section A)[3] submissions, absent a reasoned explanation as to why the form and manner of its submissions prevents Commerce from discerning: (a) the total Q&V of U.S. sales of further processed merchandise made by Steelscape LLC (Steelscape) (BlueScope's U.S. affiliated processor); (b) whether Steelscape made the only sales that could serve as the basis of constructed export price (CEP) during the period of review (POR); (c) the total Q&V of subject merchandise entered into the United States; and (d) whether sales by AIS to BlueScope Steel Americas (BSA) (BlueScope's U.S. affiliated importer) represented the total Q&V of those entries;

(3) comply with its obligation, under section 782(d) of the Act, to notify BlueScope of the nature of the alleged deficiencies in its Section A and Section C[4] responses concerning the U.S. sales reconciliation and the nature of the alleged deficiencies in its Section B[5] responses concerning its home market sales reconciliation, and to provide an opportunity to remediate such deficiencies; and

(4) if Commerce continues to find that the use of facts available is warranted, and makes an additional, distinct finding that the application of adverse inferences is warranted because BlueScope failed to cooperate "to the best of its ability" under section 776(b) of the Act, support those findings with substantial evidence.

---

[3] Section A of the questionnaire is the section relating to general information about the company (*e.g.*, corporate structure, accounting practices, the Q&V of the company's U.S. and home market sales, *etc.*).
[4] Section C of the questionnaire is the section relating to U.S. sales.
[5] Section B of the questionnaire is the section relating to comparison market sales.

As set forth below, pursuant to the *Remand Opinion and Order*, we issued a supplemental

questionnaire to BlueScope to address deficiencies in BlueScope's responses, to which it

provided timely responses.[6]  We also reexamined and reevaluated the record of the instant

administrative review and considered comments on our Draft Remand Results.[7]  Consequently,

for the purposes of these final results of redetermination, we determine that BlueScope has

provided timely and complete responses such that the application of facts available is

unnecessary and, consequently, we find that the application of AFA is no longer warranted.  As a

result, we have calculated a weighted-average dumping margin of 4.95 percent for BlueScope.[8]

## II.   BACKGROUND

On December 7, 2017, Commerce initiated an administrative review of the AD order

concerning imports of hot-rolled steel from Australia covering the period March 22, 2016,

through September 30, 2017.[9]  In the *Preliminary Results*, Commerce determined that BlueScope

provided deficient responses and failed to provide information in the manner and form requested,

thereby significantly impeding the administrative review.[10]  Further, we determined that

---

[6] *See* BlueScope's Letter, "BlueScope's Response to Department Information Request Dated December 22nd Certain Hot-Rolled Steel Flat Products from Australia," dated January 7, 2022 (BlueScope January 7, 2022 SQR); *see also* BlueScope's Letter, "BlueScope's Response to the Remaining Questions of the Department's Supplemental Questionnaire Certain Hot-Rolled Steel Flat Products from Australia," dated January 11, 2022 (BlueScope January 11, 2022 SQR).
[7] *See* Draft Results of Redetermination Pursuant to Court Remand, *BlueScope Steel LTD. v. United States*, Court No. 19-00057, Slip Op. 21-160 (CIT November 30, 2021), issued on February 7, 2022 (Draft Remand Results); *see also* U.S. Steel's Letter, "Certain Hot-Rolled Steel Products from Australia:  United States Steel Corporation's Comments on Draft Remand Redetermination," dated February 14, 2022 (U.S. Steel Comments); and  BlueScope's Letter, "BlueScope's Comments on The Department's Draft Redetermination Pursuant to Court Remand Certain Hot-Rolled Steel Flat Products from Australia," dated February 14, 2022 (BlueScope Comments).
[8] *See* Memorandum, "Final Remand Calculations for BlueScope Steel Ltd.," dated concurrently with these final results of redetermination (Final Remand Analysis Memorandum).  Commerce intends to issue instructions to U.S. Customs and Border Protection (CBP) regarding the liquidation of subject merchandise produced and/or exported by BlueScope during the POR.  As the cash deposit rate for subject merchandise produced and/or exported by BlueScope has been superseded by subsequent administrative reviews of the AD order, Commerce does not intend to issue cash deposit instructions.
[9] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 57705 (December 7, 2017).
[10] *See Certain Hot-Rolled Steel Flat Products from Australia:  Preliminary Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 56817 (November 14, 2018) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 7-10.

BlueScope failed to cooperate to the best of its ability with Commerce's request for information.[11]  Accordingly, we applied facts otherwise available, with an adverse inference, pursuant to sections 776(a) and (b) of the Act.[12]

In the *Final Results*, Commerce made no changes to the *Preliminary Results* and continued to find that the use of AFA was appropriate.[13]  Therefore, for the *Final Results*, Commerce applied a 99.20 percent dumping margin to BlueScope.

On November 30, 2021, the court remanded the *Final Results* to Commerce to reexamine the record in this case, as well as the use of facts available with respect to BlueScope.  On December 22, 2021, we issued a questionnaire to BlueScope to address deficiencies in BlueScope's responses.  On January 7 and 11, 2022, BlueScope provided timely responses to this questionnaire.[14]

On February 7, 2022, Commerce issued its Draft Remand Results, in which we recalculated BlueScope's weighted-average dumping margin consistent with the administrative record.[15]  We invited interested parties to comment on this finding.[16]  On February 17, 2022, United States Steel Corporation (U.S. Steel) and BlueScope filed timely comments on the Draft Remand Results.[17]

---

[11] *Id.*
[12] *Id.*
[13] *See Final Results* IDM at Comment 1.
[14] *See* BlueScope January 7, 2022 SQR; *see also* BlueScope January 11, 2022 SQR.
[15] *See* Draft Remand Results.
[16] *Id.*
[17] *See* U.S. Steel Comments; *see also* BlueScope Comments.

## III.    ANALYSIS

### A.  APPLICATION OF AFA IN THE ADMINISTRATIVE REVIEW

In the underlying administrative review, Commerce determined that the record lacked necessary and usable information under section 776(a)(1) of the Act.[18]  We also found that BlueScope withheld requested information, failed on multiple occasions to report its Q&V information in the requested form and manner, and significantly impeded this review.[19]  As a result, we determined that recourse to the facts available was appropriate under sections 776(a)(2)(A)-(C) of the Act.[20]

Significantly, we found that BlueScope failed to provide both a usable total consolidated U.S. sales quantity for the POR and a usable U.S. sales reconciliation.  Further, we found that BlueScope made significant unsolicited and unexplained changes to its final home market sales database[21] and that these changes could not be linked to BlueScope's previously-submitted information.[22]  As a result, we found that BlueScope's home market and U.S. sales reconciliations, which are core to our margin calculations, were unreliable.  Because BlueScope had the necessary information in its possession but failed to cooperate to the best of its ability by supplying it, we concluded that the application of an adverse inference to facts otherwise available was warranted under section 776(b) of the Act.  Therefore, we assigned BlueScope a final dumping margin of 99.20 percent using total AFA.[23]

---

[18] *See Preliminary Results* PDM at 7-10; *see also Final Results* IDM at Comment 1.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *See Final Results.*

## B.  ANALYSIS

Following the *Remand Opinion and Order*, we re-examined BlueScope's responses in the underlying review.  After re-evaluating the information on the record, we issued a supplemental questionnaire to BlueScope identifying the deficiencies in its previous responses.  BlueScope provided the necessary information in response.[24]

We find for these final results of redetermination that we are able to tie BlueScope's reported Q&V information to the sales databases provided, as well as to tie changes BlueScope made to its home market sales databases to its narrative responses.  Given there is no gap in the administrative record, we find it inappropriate to base BlueScope's final dumping margin on facts available, and have recalculated the company's individual dumping margin, as discussed further below.

## C.  DISCUSSION OF THE METHODOLOGY

*Affiliation*

Commerce selected BSL as the mandatory respondent in the instant review.  In its initial questionnaire response, BlueScope stated that BSL's wholly-owned subsidiary AIS produced hot-rolled steel during the POR.[25]  BSL and its affiliated distributor, BlueScope Steel Distribution (BSD), sold AIS's hot-rolled steel in the home market to affiliated and unaffiliated customers during the POR.[26]

BlueScope stated that it made all of its sales to the United States during the POR through its wholly-owned subsidiary, BSA, who sold all the subject merchandise that it purchased from

---

[24] *See* BlueScope January 7, 2022 SQR; *see also* BlueScope January 11, 2022 SQR.
[25] *See* BlueScope's Letter, "BlueScope Steel's Section A Questionnaire Response Hot-Rolled Flat Products from Australia," dated January 8, 2018 (BlueScope January 8, 2018 AQR) at 8.
[26] *Id.*

BSL to another affiliate, Steelscape.[27]  As in the home market, AIS produced all of the hot-rolled steel that BSA and Steelscape sold during the POR.  After importation, Steelscape further manufactured the subject merchandise it purchased from BSA by pickling the steel, cold-rolling it, and then coating it either with zinc to produce galvanized steel or with a zinc-aluminum mixture to produce galvalume steel, prior to sale.  Steelscape also painted a substantial portion of these products.  Steelscape then sold this further manufactured merchandise in the United States.

In the less-than-fair-value (LTFV) investigation, we determined that BSL, AIS, and BDL constituted a single entity.  Because no interested parties submitted comments on this issue in the underlying review, and in the absence of any new information regarding this finding, Commerce is continuing to find that BSL, AIS, and BDL are affiliated, pursuant to sections 771(33)(E) and (F) of the Act, and are considered a single entity, pursuant to 19 CFR 351.401(f).[28]

*Comparisons to Normal Value (NV)*

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether BlueScope's sales of subject merchandise from Australia to the United States were made at less than NV, Commerce compared the CEP to the NV as described in the "Constructed Export Price" and "Normal Value" sections below.

1.  Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average export prices (EPs) (or CEPs)

---

[27] *Id.* at 6-7.
[28] *See Certain Hot-Rolled Steel Flat Products from Australia:  Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 15241 (March 22, 2016), and accompanying PDM, unchanged in *Certain Hot-Rolled Steel Flat Products from Australia:  Final Determination of Sales at Less Than Fair Value*, 81 FR 53406 (August 12, 2016), and accompanying IDM; *see also Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom:  Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 FR 67962 (October 3, 2016).

(*i.e.*, the average-to-average method) unless Commerce determines that another method is appropriate in a particular situation.  In LTFV investigations, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of administrative reviews, the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is analogous to the issue in LTFV investigations.

In numerous investigations and reviews, Commerce applied a "differential pricing" analysis for determining whether application of average-to-transaction comparisons is appropriate in a particular situation pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act.  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in this administrative review.

The differential pricing analysis used in these final results of redetermination examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all export sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the consolidated customer codes reported by the respondent.  Regions are defined using the reported destination

code (*i.e.*, ZIP codes) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the POR being examined based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied.  The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test:  small, medium, or large (0.2, 0.5, and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test.  If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage (*i.e.*, the Cohen's *d* test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences.  In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only.  If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative

comparison method would be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

Interested parties presented no arguments in relation to the above-described differential pricing approach, and, therefore, we have continued to use it in these final results of redetermination

2.   Results of the Differential Pricing Analysis

Based on the results of the differential pricing analysis, Commerce finds that 49.30 percent of the value of BlueScope's U.S. sales pass the Cohen's *d* test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, and time periods.  Further, Commerce determines that the average-to-average method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the average-to-average method and when calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test.  Thus, for these final results of redetermination, Commerce is applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test to calculate the weighted-average dumping margin for BlueScope.

3.  Product Comparisons

For purposes of determining an appropriate product comparison to U.S. sales, in accordance with section 771(16)(A) of the Act, we considered all products produced and sold by BlueScope in Australia, as described in the "Scope of the Order" section in the *Final Results*,[29] that were sold in the ordinary course of trade.  In making the product comparisons, we matched foreign like products to the products sold in the United States based on their physical characteristics.  In order of importance, these physical characteristics are:  painting, minimum-specified carbon content, quality, minimum-specified yield strength, nominal thickness, nominal width, form, pickling, and patterns in relief.

Pursuant to 19 CFR 351.414(f), we compared U.S. sales of hot-rolled steel to home market sales of hot-rolled steel within the contemporaneous window period, which extends from three months prior to the month of the first U.S. sale until two months after the month of the last U.S. sale.  In all instances, we found sales of identical merchandise in the home market made in the ordinary course of trade to compare to U.S. sales.  Therefore, it was unnecessary to compare U.S. sales of hot-rolled steel to sales of the most similar non-identical foreign like product made in the ordinary course of trade, according to section 771(16)(B) of the Act.

*Date of Sale*

Section 351.401(i) of Commerce's regulations states that, "{i}n identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business."  The regulation further provides that Commerce may use a date other than the date of invoice if Commerce is satisfied that a different date better reflects the date on which the

---

[29] *See Final Results* IDM at 3-5.

exporter or producer establishes the material terms of sale.[30]  Commerce has a long-standing practice of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established.[31]

For its both its home market and U.S. sales, BlueScope reported the earlier of shipment date (*i.e.*, the date the merchandise leaves the factory or warehouse), or invoice date as the date of sale.[32]  Accordingly, for these final results of redetermination, we have relied on BlueScope's reported dates of sale in our calculations.

*Constructed Export Price*

BlueScope reported that its sales to the United States were all made on a CEP basis.[33]  In accordance with section 772(b) of the Act, CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise, or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)."

We calculated CEP based on the packed, delivered prices to unaffiliated purchasers in the United States.  Where applicable, we adjusted these prices for movement expenses (*e.g.*, foreign inland freight, foreign brokerage and handling, U.S. brokerage and handling, international freight, marine insurance, and U.S. inland freight (offset by freight revenue)), in accordance with

---

[30] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp.* v. *United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

[31] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 10; and *Notice of Final Determination of Sales at Less Than Fair Value:  Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[32] *See* BlueScope January 11, 2022 SQR at 3 and 9.

[33] *See* BlueScope's Letter, "BlueScope Steel Ltd.'s Response to Section C of the Department's Antidumping Questionnaire Hot-Rolled Flat Products from Australia," dated January 23, 2018 (BlueScope January 23, 2018 CQR) at 12.

section 772(c)(2)(A) of the Act.  Where applicable, we reduced capped freight revenue by the amount of freight incurred, in accordance with our practice.[34]

In accordance with section 772(d)(1) of the Act, we calculated the CEP by deducting selling expenses associated with economic activities occurring in the United States, which include direct selling expenses (*i.e.*, imputed credit expenses) and indirect selling expenses (*i.e.*, inventory carrying costs and other indirect selling expenses).  Additionally, we made an adjustment to CEP for the cost of any further manufacturing of subject merchandise that entered the United States and then was further manufactured, in accordance with section 772(d)(2) of the Act.

We also made an adjustment for profit allocated to CEP selling expenses, in accordance with section 772(d)(3) of the Act.  In accordance with section 772(f) of the Act, we calculated the CEP profit rate using the expenses incurred by BlueScope and its U.S. affiliates, BSA and Steelscape, on their sales of subject merchandise in the United States and the profit associated with those sales.

*Normal Value*

1.  Home Market Viability

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV (*i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales), Commerce normally compares the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act.  If Commerce determines that no viable home market

---

[34] *See, e.g.*, *Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review*, 74 FR 40167 (August 11, 2009), and accompanying IDM at Comment 3.

exists, Commerce may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

In these final results of redetermination, Commerce determined that the aggregate volume of home market sales of the foreign like product for BlueScope was greater than five percent of the aggregate volume of its U.S. sales of the subject merchandise.  Therefore, Commerce used home market sales as the basis for NV for BlueScope, in accordance with section 773(a)(1)(B) of the Act.[35]

2. Affiliated Party Transactions and Arm's-Length Test

Commerce may calculate NV based on a sale to an affiliated party only if it is satisfied that the price to the affiliated party is comparable to the price at which sales are made to parties not affiliated with the exporter or producer, *i.e.*, sales were made at arm's-length prices.[36] Commerce excludes home market sales to affiliated customers that are not made at arm's-length prices from our margin analysis because Commerce considers them to be outside the ordinary course of trade.  Consistent with 19 CFR 351.403(c) and (d) Commerce "may calculate normal value based on sales to affiliates if satisfied that the transactions were made at arm's length."[37]

To test whether BlueScope's home market sales to affiliated customers were made at arm's-length prices, Commerce compared the prices to these customers to the prices of sales of comparable merchandise to unaffiliated customers, net of price adjustments, movement charges, direct selling expenses, and packing.  Pursuant to 19 CFR 351.403(c) and in accordance with our practice, when the prices charged to an affiliated customer were, on average, between 98 and 102

---

[35] *See* BlueScope January 8, 2018 AQR at 3 and Exhibit A-1.
[36] *See* 19 CFR 351.403(c).
[37] *See China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1367 (CIT 2003), *aff'd*, 306 F. Supp. 2d 1291 (CIT 2004).

percent of the prices charged to unaffiliated parties for merchandise comparable to that sold to the affiliated customer, Commerce determined that the sales to that affiliated customer were at arm's-length prices.[38]  In these final results of redetermination, Commerce excluded sales to affiliated customers in the home market that were not made at arm's-length prices from our analysis because we considered these sales to be outside the ordinary course of trade.[39]

3.  Level of Trade

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same level of trade (LOT) as the U.S. sales.  Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[40]  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[41]  In order to determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, Commerce examined the distribution system in each market (i.e., the chain of distribution), including selling functions and class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for EP and comparison market sales (i.e., NV based on either home market or third country prices),[42] Commerce considers the starting prices before any adjustments.  For CEP sales, Commerce

---

[38] See Antidumping Proceedings:  Affiliated Party Sales in the Ordinary Course of Trade, 67 FR 69186, 69187 (November 15, 2002).
[39] See 19 CFR 351.102(b)(35).
[40] See 19 CFR 351.412(c)(2).
[41] Id.; see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part, 75 FR 50999 (August 18, 2010) (OJ from Brazil), and accompanying IDM at Comment 7.
[42] Where NV is based on constructed value (CV), we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative expenses, and profit for CV, where possible.  See 19 CFR 351.412(c)(1).

considers only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[43]

When Commerce is unable to compare the NV based on the prices of the foreign like product in the comparison market with CEP at the same LOT, Commerce may compare the U.S. sale prices to sale prices at a different LOT in the comparison market.  In comparing CEP to sale prices at a different LOT in the comparison market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.  Finally, for CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of CEP sales and there is no basis for determining whether the difference in LOTs between NV and CEP affects price comparability (*i.e.*, no LOT adjustment is possible), Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[44]

BlueScope does not claim that its home market and U.S. sales were made at different LOTs.[45]  We have examined the selling functions that BlueScope performed to sell to each market and determine that there is one LOT in the home market and one LOT for the U.S. market.  Finally, we compared the U.S. LOT to the home market LOT and found that the selling functions performed for U.S. and home market customers do not differ significantly, as BlueScope performed the same selling functions in both markets.  Accordingly, based on record information, we determine that sales to the U.S. and home markets during the POR were made at the same LOT, and, as a result, no LOT adjustment or CEP offset is warranted with respect to BlueScope.  Accordingly, we have not granted a CEP offset, pursuant to section 773(a)(7)(B) of the Act.

---

[43] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).
[44] *See, e.g.*, *OJ from Brazil* IDM at Comment 7.
[45] *See* BlueScope January 23, 2018 CQR at 27.

4.   Cost of Production Analysis

In accordance with section 773(b)(2)(A)(ii) of the Act, Commerce requested cost of production (COP) information from BlueScope.  We examined BlueScope's cost data and determined that our quarterly cost methodology was not warranted and, therefore, we applied our standard methodology of using annual costs based on the reported data.

5.   Calculation of COP

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of the costs of materials and fabrication for the foreign like product, plus amounts for general and administrative expenses and interest expenses.  We relied on the COP data submitted by BlueScope, as reported in its most recently-submitted cost databases, for the COP calculation without adjustment.[46]

a.   Test of Comparison Market Sales Prices

On a product-specific basis, pursuant to section 773(b) of the Act, we compared the weighted-average COPs to the home market sales prices of the foreign like product to determine whether the sales prices were below the COPs.  In particular, in determining whether to disregard home market sales made at prices below the COP, we examined whether such sales were made within an extended period of time in substantial quantities and at prices which permitted the recovery of all costs within a reasonable period of time, in accordance with sections 773(b)(2)(B), (C), and (D) of the Act.  For purposes of this comparison, we used COP exclusive of selling and packing expenses.  The prices were net of billing adjustments, movement expenses, actual (*i.e.*, not imputed) selling expenses, and packing expenses, where appropriate.

---

[46] *See* Final Remand Analysis Memorandum.

      b.  Results of the COP Test

In determining whether to disregard home market sales made at prices below the COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether:  (1) within an extended period of time, such sales were made in substantial quantities; and (2) such sales were made at prices which permitted the recovery of all costs within a reasonable period of time in the normal course of trade.  In accordance with sections 773(b)(2)(B) and (C) of the Act, where less than 20 percent of the respondent's comparison market sales of a given product are at prices less than the COP, we do not disregard any below-cost sales of that product because we determine that in such instances the below-cost sales were not made within an extended period of time and in "substantial quantities."  Where 20 percent or more of a respondent's sales of a given product are at prices less than the COP, we disregard the below-cost sales when:  (1) they were made within an extended period of time in "substantial quantities," in accordance with sections 773(b)(2)(B) and (C) of the Act; and (2) based on our comparison of prices to the weighted average COPs for the POR, they were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act.

We found that more than 20 percent of BlueScope's comparison market sales during the POR were at prices less than the COP and, in addition, such sales did not provide for the recovery of costs within a reasonable period of time.  We, therefore, excluded these sales and used the remaining sales as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

    6.  Calculation of NV Based on Comparison Market Prices

We calculated NV based on delivered or ex-factory prices to unaffiliated customers.  We made adjustments, where appropriate, from the starting price for billing adjustments, in

accordance with 19 CFR 351.401(c).  We also made deductions for movement expenses, including inland freight, inland insurance, and warehousing expenses, under section 773(a)(6)(B)(ii) of the Act.

For comparisons to CEP sales, we made deductions for home market imputed credit expenses, pursuant to section 773(a)(6)(C) of the Act.  We also deducted home market packing costs and added U.S. packing costs, in accordance with sections 773(a)(6)(A) and (B) of the Act.

*Currency Conversion*

We made currency conversions into U.S. dollars in accordance with section 773A(a) of the Act and 19 CFR 351.415, based on the exchange rates in effect on the dates of the U.S. sales as certified by the Federal Reserve Bank.  The exchange rates are available on the Enforcement and Compliance website at http://enforcement.trade.gov/exchange.

## IV.    DRAFT REMAND RESULTS COMMENTS

## Comment 1:  Commerce Should Continue to Apply AFA

*U.S. Steel Comments*

- Commerce acted within its discretion under section 776(a) of the Act in applying facts available upon concluding that BlueScope withheld requested information, failed on multiple occasions to report its Q&V information in the requested form and manner, and significantly impeded the underlying review.  Commerce has wide discretion when applying AFA.[47]

- Further, Commerce has discretion to determine what information it needs to calculate a dumping margin.[48]  The United States Court of Appeals for the Federal Circuit (CAFC)

---

[47] *See* U.S. Steel Comments at 5-6 (citing *Seah Steel Vina Corp. v. U.S.*, 182 F. Supp. 3d 1316, 1325 (CIT 2016)).
[48] *Id.* at 6 (citing *Guangdong Chems. Imp. & Exp. Corp. v. United States*, 414 F. Supp. 2d 1300, 1310 (CIT 2006); *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, Court No. 10-00059, Slip Op. 11-123 at 23

recently affirmed Commerce's broad discretion to apply facts available based on a respondent's "repeated disclosure of partial, aggregate, or sample information rather than complete and itemized information."[49]

- Commerce sent BlueScope five separate questionnaires, which put BlueScope on notice that its reporting was deficient.  Commerce determined that BlueScope's home market and U.S. sales reconciliations were unreliable and that BlueScope's sales databases consisted of significant changes with no way for Commerce to ensure the BlueScope had made the requested changes.[50]

- The Act does not require Commerce to afford BlueScope multiple opportunities to explain and correct the record.  The CAFC has held that, when a respondent "had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified {the respondent} of that defect, § 1677m(d) does not require more."[51]

- While the CIT may have concluded that it could decipher BlueScope's reporting, it is beyond the court's role to reweigh evidence.[52]  Commerce would have been within its right to further detail its reasoning for declining to use BlueScope's information and continue to apply facts available on remand.  Commerce should consider the impact on its proceedings before complying with the *Remand Opinion and Order*.

---

(CIT October 12, 2011) (*Foshan Shunde*); and *Nat'l Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1376-77 (CIT 2018)).
[49] *Id.* (citing *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021)).
[50] *Id.* (citing Draft Remand Results at 4; and *Remand Opinion and Order*, 548 F.Supp.3d at 1367).
[51] *Id.* at 7 (citing *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017)).
[52] *Id.* (citing *Remand Opinion and Order*, 548 F.Supp.3d at 1361; and *Weishan Hongda Aquatic Food Co. v. United States*, 273 F. Supp. 3d 1279, 1286 (CIT 2017)).

**Commerce's Position:**

We disagree with U.S. Steel that Commerce should continue to base BlueScope's final dumping margin on total AFA.  We find there is no gap in the record (*i.e.*, with respect to BlueScope's Q&V reporting, U.S. sales reconciliation, or home market sales database), and U.S. Steel fails to point to any gaps that would warrant the application of facts available, much less AFA.  Indeed, the record contains all information required to calculate BlueScope's margin.

**Comment 2:  Commerce Should Reject a Certain Home Market Rebate**

*U.S. Steel Comments*

- Commerce should deny BlueScope's reported home market rebate reported in its latest supplemental questionnaire response.[53]  BlueScope did not report this rebate in its initial questionnaire response.[54]

- Further, BlueScope did not provide supporting documents to demonstrate that BlueScope's customers were aware of the terms and conditions of the specific rebate prior to the sale, as required by Commerce's regulations.[55]

**Commerce's Position:**

As an initial matter, we disagree with U.S. Steel that BlueScope reported a new home market rebate in its latest supplemental questionnaire response.  Contrary to U.S. Steel's claim, the rebate at issue is not new.  Rather, it is simply a reference to the system itself by which

---

[53] *See* U.S. Steel Comments at 4-5.
[54] *Id*. at 4 (citing BlueScope's Letter, "BlueScope Steel Ltd.'s Response to Section B of the Department's Antidumping Questionnaire:  Hot-Rolled Flat Products from Australia," dated January 24, 2018 (BlueScope January 24, 2018 BQR) at 25).
[55] *Id*. at 4-5 (citing BlueScope January 7, 2022 SQR at 22-23 and Exhibit RB-8; Commerce's Letter, "Supplemental Questionnaire," dated December 22, 2021 at 5; 19 CFR 351.401(c); and *Certain Hot-Rolled Steel Flat Products from Australia:  Final Results of Antidumping Duty Administrative Review and Final Rescission of Review, in Part; 2018-2019*, 86 FR 47054 (August 23, 2021), and accompanying IDM at Comment 4).

BlueScope notifies a certain group of its customers of the terms and conditions of its rebate programs.[56]

Further, we disagree with U.S. Steel that BlueScope failed to provide supporting documentation for its rebate programs.  BlueScope provided sufficient supporting documentation that its customers were aware of the terms and conditions of each of these four rebate programs prior to the date of sale.[57]  Commerce's rebate practice is discussed in the *Final Modification*, where we state that, in determining whether a party has demonstrated its entitlement to a rebate adjustment, Commerce may consider a number of factors including, among other things, whether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale.[58]  Because the record shows that BlueScope's customers knew prior to the sale the terms and conditions of each of the reported home market rebates, we are continuing to find that BlueScope was entitled to an adjustment to home market price for each of these rebates.

**Comment 3:  Commerce Should Correct Certain Ministerial Errors**

*U.S. Steel Comments*

- Commerce mistakenly double counted certain of BlueScope's home market expenses, which it reported in the fields INLFTWH2, INLFTWH4, WAREHSH2, DIRSELH1, DIRSELH2, and DIRSELH3 in its home market sales database.[59]  BlueScope included the expenses reported in these fields in the home market sales database only to reconcile

---

[56] *See* BlueScope January 7, 2022 SQR at 22-23.
[57] *Id.* at Exhibit RB-8.
[58] *See Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 FR 15641 (March 24, 2016) (*Final Modification*).
[59] *See* U.S. Steel Comments at 2-4.

this database to BlueScope's cost database.[60]  Therefore, Commerce should not deduct the expenses in the above-mentioned fields from the home market gross unit price.

*BlueScope Comments*

- Commerce mistakenly classified the home market selling expenses reported in the fields CLAIMH and CLAIMH2 as price adjustments (*i.e.*, part of HMGUPADJ), rather than the as direct selling expenses (*i.e.*, as part of HMDSELL).[61]  Commerce should revise its calculations to treat these expenses as home market direct selling expenses.

- Commerce incorrectly double counted certain further manufacturing expenses (*i.e.*, FURGNA and FURINT) when calculating U.S. net price.[62]  As explained in BlueScope's supplemental response, costs reported in the field FURMANU_REMAND already included the costs reported in the fields FURGNA and FURINT.[63]  Therefore, Commerce should remove the fields FURGNA and FURINT from its U.S. net price calculations to avoid double counting these expenses.

**Commerce's Position:**

We agree that we inadvertently deducted BlueScope's home market expenses (*i.e.*, the fields INLFTWH2, INLFTWH4, WAREHSH2, DIRSELH1, DIRSELH2, and DIRSELH3) twice in calculating BlueScope's home market net price.  BlueScope stated in its questionnaire response that it had included the fields INLFTWH2, INLFTWH4, WAREHSH2, DIRSELH1, DIRSELH2, and DIRSELH3 in its home market sales database for reconciliation purposes only,

---

[60] *Id.* at 3 (citing BlueScope January 11, 2022. at 26-67; BlueScope January 24, 2018 BQR at 28 and 37; and BlueScope's Letter, "BlueScope Steel Distribution's Response to Section B of the Department's Antidumping Questionnaire:  Hot-Rolled Flat Products from Australia," dated February 1, 2018 at 26 and 32-33).
[61] *See* BlueScope Comments at 2-3.
[62] *Id.* at 3.
[63] *Id*. (citing BlueScope January 11, 2022 SQR at 45).

and that BlueScope already incorporated those costs in its cost database.[64]  We have removed these fields from our calculation of home market net price.[65]

We further agree that we incorrectly added the fields CLAIMH and CLAIMH2 to BlueScope's home market net price.  BlueScope reported in its questionnaire response that the amounts reported in the fields CLAIMH and CLAIMH2 represent claims made by customers and should be subtracted from the gross unit price.[66]  We have revised our calculations to classify these claims as selling expenses, which we have now deducted from home market price (via a circumstance-of-sale adjustment).

Finally, we agree that the further manufacturing expenses reported in fields FURGNA and FURINT were captured in the field FURMANU_REMAND,[67] and that, by including all three fields in the calculation of other CEP expenses, we inadvertently double counted these expenses.  For these final results of redetermination, we have removed the fields FURGNA and FURINT from the calculation of other CEP expenses.[68]

## V.      FINAL RESULTS OF REDETERMINATION

We recalculated the POR weighted-average dumping margin for BlueScope consistent with record evidence, including BlueScope's supplemental response.  In our final calculations, we corrected the ministerial errors noted above.  As a result, BlueScope's estimated weighted-average dumping margin is 4.95 percent.  Because the weighted-average dumping margin for

---

[64] *See* BlueScope January 11, 2022 SQR at 26-27.
[65] *See* Final Remand Analysis Memorandum.
[66] *See* BlueScope's Letter, "BlueScope Steel Ltd.'s Response to Sections B and C of the Department's Supplemental Section A-C Questionnaire Hot-Rolled Steel Flat Products from Australia," dated July 20, 2018 at 24-25.
[67] *See* BlueScope January 11, 2022 SQR at 45.
[68] *See* Final Remand Analysis Memorandum.

BlueScope is different from that in the *Final Results*, we intend to issue a *Timken* notice with the amended final results should the Court sustain these final results of redetermination.

4/12/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

26